UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

**CV 12 - 2751**

JUAN CALIXTO,

Plaintiff,

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

-v-

THE CITY OF NEW YORK, New York City Police
Department Officer ("P.O.") P.O. SALVATOR GRECO
(Shield No. 8602), P.O. MICHAEL SPENNATO (Shield
No.24002), P.O. JOHN DOE 1 through P.O. JOHN DOE
3, (the names John Doe being fictitious, as their true
names and shield numbers are presently unknown), in
their individual capacities,

12-CV-_____

**VITALIANO, J.**

**GOLD, M.J.**

Defendants.

**SUMMONS ISSUED**

------------------------------------------------------------x

Plaintiff JUAN CALIXTO, by his attorneys DAVID B. RANKIN and ROBERT M.
QUACKENBUSH of Rankin and Taylor, PLLC, as and for his complaint, does hereby state and
allege:

<u>**PRELIMINARY STATEMENT**</u>

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth and
   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights
   Act of 1871, <u>as amended</u>, codified as 42 U.S.C. § 1983, and a pendant claim for malicious
   prosecution under the Constitution and laws of the State of New York.

2. Plaintiff JUAN CALIXTO's rights were violated when officers of the New York City Police
   Department ("NYPD") unconstitutionally and without any legal basis arrested and used
   gratuitous, unlawful force against the plaintiff, despite knowing there was no justification for
   an arrest or use of force. By reason of defendants' actions, particularly their unreasonable use

1

of force and unlawful arrest, plaintiff was deprived of his constitutional, statutory and common law rights.

3. Specifically, apparently frustrated that they were unable to catch up to a robbery suspect they were pursuing on foot, defendant NYPD Officer ("P.O.") GRECO and another officer-defendant arrested plaintiff, assaulted him, and initiated knowingly-bogus charges based upon facts that had no basis in reality. Plaintiff was incarcerated for four days until he was released on his own recognizance pursuant to New York Criminal Procedure Law § 180.80.

4. However, while the charges were still pending, P.O. GRECO and other officers executed a pre-dawn raid on plaintiff's home. The officers took plaintiff outside his home and set up a line-up. The witness, however, did not identify the plaintiff. Despite this negative identification, P.O. GRECO and other officers arrested plaintiff.

5. Once plaintiff got to Central Booking, however, officers let him out the side door, without charges related to the second arrest.

6. Soon after, all charges against plaintiff related to the first arrest were dismissed in their entirety.

7. Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States, as well for violations of the laws of the State of New York.

9. Pursuant to New York State General Obligations Law § 50-G, the plaintiff filed a timely Notice of Claim with the New York City Comptroller on or about December 13, 2011, within

ninety (90) days of the dismissal of the criminal charges against him. Thus, this Court has supplemental jurisdiction over plaintiff's claim for malicious prosecution under the laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

10. Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

11. Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiff's claim arose in the Eastern District of New York.

12. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

13. Plaintiff JUAN CALIXTO is, and was at all times relevant to this action, a resident of the State of New York and the County of Kings.

14. Defendant CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force, as well as the employment of police officers, as said risks attach to the public consumers of the services provided by NYPD.

15. New York City Police Department Officer ("P.O.") P.O. SALVATOR GRECO (Shield No. 8602), P.O. MICHAEL SPENNATO (Shield No. 24002), P.O. JOHN DOE 1 through P.O. JOHN DOE 3 (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

16. The individual defendants are being sued herein in their individual capacities.

17. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

18. The true names and shield numbers of defendants P.O. DOE 1 through P.O. DOE 3 are not currently known to the plaintiff.[1] However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Obligations Law § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiff intends to name said officers as defendants in an amended pleading once the true names and shield numbers of said defendants becomes known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

### STATEMENT OF FACTS

#### MARCH 2, 2011 ARREST

19. The events described herein occurred primarily on March 1, 2011 at approximately 2:30 a.m. in the Brighton Beach B and Q train station above the intersection of Brighton Beach Avenue and Brighton 6th Street in Kings County.

20. At approximately the time and place described supra, plaintiff was attempting to purchase an MTA card from the vending machine in the station entryway. Plaintiff had noticed two (2)

---

[1] By identifying said officers as "John Doe" and "Richard Roe," plaintiff is making no representations as to the gender of said officers.

NYPD Officers, defendants P.O. GRECO and P.O. SPENNATO, walking through the station.

21. On information and belief, P.O. GRECO and P.O. SPENNATO were pursuing an unknown individual suspect and, having lost sight of that individual, decided to arrest and assault plaintiff in an attempt to meet the NYPD's quotas, or so-called "productivity goals."

22. While his attention was focused on the vending machine, plaintiff was struck in the back and right side of his head by an object, believed to be an Asp or expandable metal baton, held by either defendant P.O. GRECO and P.O. SPENNATO.

23. These officers then forced plaintiff to the ground and pinned him down such that plaintiff's right was trapped between his chest and the ground. The officers handcuffed his left hand, but plaintiff could not move his right hand because the officers were continuing to pin plaintiff to the ground on top of it.

24. These officers continued to beat Plaintiff. During this time one of the officers shouted, in sum and substance, "THERE IS A GUN!"

25. At no time on March 1, 2011 did plaintiff have possession of a gun.

26. Due to the officer's use of force plaintiff lost consciousness and woke up in an NYPD squad car. He was taken to the NYPD's 60th Precinct located at 2951 West 8th Street in Brooklyn.

27. While in custody at the precinct, plaintiff was ordered to write a description of what had happened the night of March 1, 2011, all before he could have food or a phone call.

28. Plaintiff wrote a description of what happened but was not given any food or allowed to make a phone call.

29. At approximately 10:30 a.m. on March 2, 2011, plaintiff was transferred from the 60th Precinct to Brooklyn Central Booking. The officers at Central Booking, however, refused to

process plaintiff due to the fact he was bleeding from his head. Plaintiff was then taken to Coney Island Hospital, where he arrived at approximately 1:00 a.m. on March 3, 2011.

30. Plaintiff treated and released from Coney Island Hospital in NYPD custody at approximately 2:45 a.m. on March 3, 2011.

31. Plaintiff was then returned to Brooklyn Central Booking.

32. Plaintiff was brought before the criminal court on March 3, 2011 and was charged on docket number 2011KN016824 with violating N.Y.P.L. §§ 160.15(4) (Robbery in the First Degree), 160.10(1) (Robbery in the Second Degree), 160.10(2)(B) (Robbery in the Second Degree), 160.05 (Robbery in the Third Degree), 120.14(1) (Menacing in the Second Degree) (three counts), 155.25 (Petit Larceny), 165.40 (Criminal Possession of Stolen Property in the Fifth Degree), 205.30 (Resisting Arrest), 265.01(1) (Criminal Possession of a Weapon in the Fourth Degree), 110/120.00(1) (Attempted Assault in the Third Degree), and 240.26 (Harassment in the Second Degree) (three counts).

33. Said charges were based upon sworn allegation of Defendant P.O. GRECO, who stated as follows:

> The deponent is informed by Bakhodur Mukhammadiev, that at the above time and place, defendant and two unapprehended individuals walked towards informant and two individuals, namely Azam Giyasov and Firdavs Urocov, that defendant, while displaying a firearm at informant, Azam Giyasov and Firdavs Urocov, stated in substance does informant, Azam Giyasov and Firdavs Urocov have a problem with defendant and that defendant is going to kill informant, Azam Giyasov and Firdavs Urocov.

> The deponent is further informed by Bakhodur Mukhammadiev, that defendant walked away from informant, Azam Giyasov and Firdavs Urocov, that defendant returned, that defendant demanded a cigarette from informant, Azam Giyasov and Firdavs Urocov, that informant handed defendant a cigarette, that defendant continued to display said firearm at informant, Azam Giyasov and Firdavs Urocov as defendant stated in sum and substance

defendant was going to bring more people into the neighborhood and that informant, Azam Giyasov and Firdavs Urocov were going to get hurt.

The deponent states that deponent and Police Office Michael Spennato, Sheild No. 24002, of 60 Command, were on patrol, while dressed in police uniform and in a police vehicle, that deponent observed defendant pointing an object at Bankhodur Mukhammadiev, that as deponent neared, deponent observed defendant's hand back down by defendant's waistband area, that defendant stated in substance to deponent defendant is not doing anything and that defendant and said [sic] unapprehended individuals began to run.

The deponent further states that a pursuit ensued, that defendant ran up the train station stairs and that as deponent and Police Officer Michael Spennato attempted to effect the arrest of defendant for the above-described action defendant resisted a lawful arrest by struggling, flailing arms, attempting to punch Police Officer Michael Spennato and refusing to be handcuffed.

The deponent further states that during the course of defendant's resisting arrest, deponent observed a firearm slide on the floor from the immediate vicinity of defendant's person.

The deponent further states that defendant recovered the above-mentioned firearm and observed it to be a .32 caliber semi-automatic pistol.

34. The sworn allegations of P.O. GRECO transcribed above are complete fabrications.

35. At the above arraignment, bail was set at $20,000, an amount which Mr. Calixto was unable to afford.

36. On March 3, 2011 at approximately, 5:00 p.m., plaintiff was transferred taken to Rikers Island.

37. Plaintiff indicated through his criminal defense counsel that he wished to testify in front of the Grand Jury in regards to his arrest. However, the District Attorney never presented the case to the Grand Jury

38. On March 5, 2011 at approximately 2:00 a.m., and pursuant to New York Criminal Procedure Law § 180.80, plaintiff was released from custody.

39. Thus, plaintiff was in defendants' custody for nearly 96 hours.

40. On September 14, 2011, the criminal court dismissed, without condition, all charges against plaintiff arising out of the March 1, 2011 arrest.

### MAY 28, 2011 ARREST

41. On May 28, 2011, at approximately 5:00 a.m., plaintiff was sleeping in his home located on Brighton Beach Avenue in Brooklyn.

42. At the above place and time, plaintiff was awoken in his bed by an officer, defendant P.O. JOHN DOE 1, kicking down his door, jumping on him and hitting him in the head.

43. Defendant P.O. DOE 1 then handcuffed plaintiff and took him downstairs to the front of his house.

44. Plaintiff, who was sleeping in his underwear, was not allowed to take his keys or put on any other clothes besides a light jersey.

45. In front of his house, several police officers, including defendants P.O. GRECO and P.O. JOHN DOES 1 through 3, were lining up several of plaintiff's neighbors for identification. Plaintiff was placed in the lineup.

46. The witness did not identify plaintiff.

47. Unbelievably, despite knowing plaintiff was not identified in the lineup, defendant P.O. GRECO insisted on taking arresting plaintiff and taking him to the precinct.

48. Plaintiff was taken to the NYPD's 61st Precinct in Brooklyn located at 2575 Coney Island Avenue in Brooklyn.

8

49. While at the 61st Precinct, plaintiff heard defendant P.O. GRECO conversing with another officer, defendant P.O. JOHN DOE 2, who told P.O. GRECO, in sum and substance, "IT'S NOT HIM. WE DON'T HAVE A CASE."

50. Defendant P.O. GRECO stated, in sum and substance, "YES, IT'S HIM."

51. Plaintiff was then taken to Brooklyn Central Booking.

52. The District Attorney declined to prosecute plaintiff related to his arrest on May 28, 2011. The arrest is identified only by arrest number K11652229.

53. On May 29, 2011 at approximately 3:00 a.m., plaintiff was released directly from Brooklyn Central Booking without any charges. Accordingly, plaintiff was in custody for approximately 22 hours related to this arrest.

### FIRST CLAIM
### DEPRIVATION OF RIGHTS
### UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

54. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

55. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, including the excessive use of force; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent; (d) freedom from the lodging of false charges against him by police officers; (e) freedom from having police officers fabricate evidence against him; (f) freedom from

9

malicious prosecution by police, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor; (g) freedom from abuse of process; and (i) freedom from deprivation of liberty without due process of law.

56. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983

57. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

58. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

59. Defendants P.O. GRECO and P.O. SPENNATO were present for the above-described incident on March 1, 2011 and witnessed each other unlawfully arrest plaintiff.

60. Defendants' use of force against plaintiff on March 1, 2011 was obviously excessive and unjustified under the circumstances yet neither defendant took any action or made any effort to intervene, halt or protect the plaintiff from being subjected to excessive force.

61. The arrest of plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendant P.O. GRECO which defendant P.O. SPENNATO knew to be false, yet defendant P.O. SPENNATO failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

62. Defendants P.O. DOE 1 through P.O. DOE 3 were present for the above-described incident on May 28, 2011, saw that plaintiff was not identified in the line-up they orchestrated, yet still chose not to intervene to prevent P.O. GRECO from placing plaintiff under arrest..

63. Defendants' violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

### THIRD CLAIM
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

64. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

65. All of the acts and omissions by P.O. GRECO, P.O. SPENNATO and the DOE defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

66. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

67. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

68. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a.  Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

b.  Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

    i.  in order to protect other officers; and/or

    ii.  in order to meet said productivity goals;

c.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

d.  Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

e.  Retaliating against officers who report police misconduct; and

f.  Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

69. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

a.  People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

b.  Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was

arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

c. Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records);

d. Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

e. Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[2]

f. Colon v. City of New York, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

g. Bryant v. City of New York, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[3]

---

[2]     For a description of this case and settlement, *see,* Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists,* N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

[3]     For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000,* N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

h.  Callaghan v. City of New York, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct);[4]

i.  McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

j.  Avent v. City of New York, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

k.  Smith v. City of New York, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

l.  Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m.  Allen v. City of New York, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

n.  Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

o.  Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

p.  Taylor v. City of New York, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

q.  Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

---

[4]     For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

r.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

s.  Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

t.  Sorlucco v. New York City Police Department, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

u.  Kaufman v. City of New York, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

70. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[5]

b.  An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He

---

[5]    Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[6]

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[7]

d. The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[8]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[9]

f. In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As

---

[6]    Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

[7]    *Id.*

[8]    James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[9]    Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[10]

g.  In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[11]

h.  Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[12] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[13]

i.  The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[14]

j.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

---

[10]     Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[11]     Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

[12]     William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[13]     Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[14]     *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

"You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[15]

71. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This

---

[15]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[16]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted the plausibility of a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[17]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct. [18] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[19] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers

---

[16]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[17]    Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[18]    In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[19]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[20]

72. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[21]

> [...]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[22]

b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled

---

[20]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[21]    Mollen Commission Report, p. 36.

[22]    Mollen Commission Report, pp. 40-41.

guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[23]

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[24] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[25]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the

---

[23]  Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[24]  Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4Ndeqcl.

[25]  *Id.*

NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[26]

e.   In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[27]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[28]

---

[26]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[27]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyltuTeLedhKWtruJZYsdL.

f.  In early 2010, the CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer [29] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[30]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[31]

73. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

---

[28]    John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[29]    In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[30]    *Id.*

[31]    David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way.".

74. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner KELLY.

75. The actions of P.O. GRECO, P.O. SPENNATO and the DOE defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by high-ranking members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal-law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner KELLY who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

76. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "55" through "62" above.

24

77. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

78. Defendant CITY is directly liable and responsible for the acts of P.O. GRECO, P.O. SPENNATO and the DOE defendants because, based upon reasonable inferences to be drawn from the allegations in this complaint, it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the CITY and NYPD and to require compliance with the Constitution and laws of the United States.

79. Despite knowledge of such unlawful de facto policies, practices and/or customs, supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

80. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, P.O. GRECO and P.O. SPENNATO felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without

probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights.

81. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

82. The actions of P.O. GRECO, P.O. SPENNATO and the DOE defendants resulted from and were taken pursuant to the following de facto policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

83. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

### FOURTH CLAIM
### MALICIOUS PROSECUTION
### UNDER THE LAWS OF THE STATE OF NEW YORK

84. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

85. By the actions described above, by the false allegations against the plaintiff in the accusatory instrument, P.O. GRECO and P.O. SPENNATO caused a criminal proceeding to be initiated against plaintiff, even though there was no probable cause for an arrest or prosecution in this matter. The individual defendants maliciously caused this prosecution to be initiated in that

they knew there was no probable cause for such prosecution and that they further wished to harm and punish plaintiff for illegitimate reasons. The criminal case against plaintiff was terminated in his favor in that all charges were dismissed in their entirety.

86. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**FIFTH CLAIM**
**_RESPONDEAT SUPERIOR_ LIABILITY OF THE CITY OF NEW YORK**
**FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK**

87. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

88. The conduct of P.O. GRECO, P.O. SPENNATO and the DOE defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as agents and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to plaintiff pursuant to the state common law doctrine of _respondeat superior_.

89. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**JURY DEMAND**

90. Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

**_WHEREFORE_** plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a. That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b. That he be awarded punitive damages against the individual defendants; and

c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         May 30, 2012

Respectfully submitted,

By: _____
    David B. Rankin
    Robert M. Quackenbush
    Law Office of Rankin & Taylor
    *Attorneys for the Plaintiff*
    350 Broadway, Suite 701
    New York, New York 10013
    t: 212-226-4507